

Hello!

This is your Offer.

_____

Chloe Happe

Customer Success Advocate, Cash App

St. Louis

07/18/2019

Dear Chloe

First of all, this is awesome! We, here at Square, Inc., a Delaware corporation (the "Company"), are really, really excited to offer you employment with the Company on the terms described below.

## KEY HIGHLIGHTS

1. **Position**.  You will start in a full-time position as Customer Success Advocate, Cash App and you will report to Rekha Poovathingal Shivaprakash. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit or restrict you from performing your duties with the Company.

2. **Compensation**.  You will be paid **USD 19.23** per hour, less applicable tax withholding and authorized deductions, payable on the Company's regular payroll dates.  Your annualized base salary (based on working a 40 hour workweek) will be **USD 39,998.00.**  You are required to record all time worked and meal periods taken.  In addition, as a non-exempt employee, you will be eligible for overtime pay and must take meal periods and rest breaks, consistent with state and federal law.

### PROTECTING YOU AND SQUARE

3. **Confidential Information and Invention Assignment Agreement**. Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's enclosed standard Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement"). This is serious stuff. We don't want you to give

away our secret sauce.

4. **Employment Relationship**. Employment with the Company is not for a specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, without prior notice and with or without cause. Any contrary representations, which may have been made to you, are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Further, your participation in any equity or benefit program is not to be regarded as assuring you of continuing employment for any particular period of time. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Chief Executive Officer.

5. **Outside Activities**.  Yes, you can have a life outside of work. But, while you render services to the Company, you agree that you will not engage in any outside activity if it could interfere with your work performance or work schedule at the Company, or if it could result in an actual or potential conflict of interest or the appearance of a conflict of interest. Outside activities include (but are not limited to) other employment, consulting, serving on a board or in another advisory capacity, and volunteer activities. In addition, while you render services to the Company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company. Per the Company's Outside Activities Policy, you must disclose to your manager in writing any other gainful employment, business or activity that you are currently associated with or participate in that has the potential to compete with the Company.

6. **Withholding Taxes**.  (It's true, you have to pay taxes) All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

7. **Authorization to Work**.   You must have authorization to work for the Company in the United States.   We ask that you present documentation demonstrating that you have authorization to work for the Company in the United States no later than three (3) days of your start date.

8. **Arbitration**.   While the Company hopes that employment disputes will not occur, the Company believes that, if they do arise, it is in the interest of everyone involved to handle them through arbitration, which seeks to resolve disputes in a manner that is faster, more efficient, and less formal than litigation in court. Therefore, your employment is subject to the arbitration agreement set forth in Addendum A, which includes a waiver of class, collective, and representative claims, unless you timely opt out of that waiver. You also may opt out of the arbitration agreement for claims of harassment, as described in the Addendum.

9. **Background Check**.   The Company may conduct an employment verification of criminal, education, and employment background. This offer can be rescinded based upon data received in the verification.

10. **Entire Agreement**.   This letter (including its Addendum A), along with the Confidentiality Agreement, the Plan, and any other restricted stock unit or stock option agreements between you and the Company governing your Company equity award(s), collectively constitute the entire agreement between you and the Company regarding the subject matter contained herein, and they supersede and replace any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter.

## LET'S MAKE IT OFFICIAL

Congratulations on making it this far! To accept this offer, please sign and date this letter, and the Confidentiality Agreement below and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. This offer, if not accepted, will expire at the close of business on 07/25/2019.

We look forward to having you join us.

Very truly yours,

Square Inc.

**By**:

Aaron Zamost
Name

Communications & People Lead
Title

07/18/2019
Date

**Accepted and agreed:**

(Signature)

Chloe Happe

Name

July 18, 2019 | 5:48 PM PDT

Date

08/19/2019
Anticipated Start Date

## ADDENDUM A -- ARBITRATION AGREEMENT

1. Through this arbitration agreement ("Agreement"), you and the Company agree that all disputes between you and the Company (including its subsidiaries, affiliates, successors, partners, employees, officers, directors, insurers, agents, investors, contractors, and vendors) must be submitted for binding arbitration with JAMS before a single, neutral arbitrator in San Francisco County. If you are interested in opting out of this Agreement for claims of harassment and/or to class, collective, and representative proceedings, please follow the procedures in Paragraph 4.

2. The arbitration shall be administered pursuant to the applicable JAMS Rules then in effect (available at www.jamsadr.com), unless such Rules are in conflict with this Agreement, in which case, the terms of this Agreement shall control. Discovery will be permitted pursuant to JAMS Rules, unless such Rules provide for legally insufficient discovery, in which case discovery shall be allowed as provided by California Code of Civil Procedure Section 1283.05, as it may be amended from time to time. The Company will pay all costs unique to arbitration that you would not have incurred in a court proceeding. Arbitration will be kept confidential to the extent permitted by law. If trade secret, confidential and/or proprietary information needs to be introduced into the arbitration, the parties will work with the arbitrator to make sure that such information is not disclosed to the public. Each party shall pay its own attorneys' fees and costs not unique to arbitration when in arbitration, except that the arbitrator may award fees and costs to the prevailing party to the extent permitted by law. The arbitrator shall have the authority to award all remedies available at law and shall issue a written decision that contains the essential findings and conclusions upon which the award is based. If one party refuses to arbitrate a covered claim and instead proceeds in court or other prohibited forum, then the other party, upon obtaining an order compelling arbitration, shall be entitled to immediate recovery of all of its fees and costs incurred in the non-arbitral action and in enforcing this Agreement, without regard to who ultimately prevails on the claims to be arbitrated. The arbitrator alone shall have the authority to interpret the scope and enforceability of this Agreement, except that any dispute concerning the scope or enforceability of the prohibition on class, collective, or representative claims must

be resolved by a court of competent jurisdiction. The Federal Arbitration Act ("FAA") shall govern the interpretation and enforcement of this Agreement.

3. **IMPORTANT WAIVER.** Arbitration must take place on an individual basis only, meaning that neither party may initiate or participate in any class, collective, or representative proceeding against the other. Thus, through this Agreement, you and Company each waive the right to initiate or participate in any class, collective, or representative proceeding ("Group Claims") against the other in any forum (including court or arbitration). See Paragraph 4 if you wish to opt out of this Paragraph.

4. **Opt-Out Procedures.** You may elect for this Agreement not to apply to claims of harassment and/or to Group Claims (defined in Paragraph 3) by notifying askpeople@squareup.com by email within 21 days from the date you sign your offer letter. Once you have so notified the Company, your opt out will become effective when you receive confirmation of receipt from the Company. If you do not receive a response confirming receipt of your intent to opt out within 14 days of your submitting it, then please promptly send a follow-up email to askpeople@squareup.com. In addition, you may elect for this Agreement not to apply to claims of harassment by notifying askpeople@squareup.com by email at the time a claim of harassment is alleged.

If you choose to opt out of this Agreement for harassment claims, then any such claims between you and the Company (regardless whether you are the alleged victim or the alleged perpetrator) must proceed in court and not in arbitration. In addition, if there are other, related disputes between you and the Company, the harassment claim in court will be stayed pending resolution of the other disputes in arbitration.

Similarly, if you choose to opt out of the waiver of Group Claims (see Paragraph 3), then any claims that you can pursue on a class, collective, or representative basis must proceed in court (not in arbitration), and any individual claims must be arbitrated.

No adverse employment action will be taken against you on account of your exercising your opt-out options.

5. This Agreement does not apply to claims that, by law, cannot be subject to pre-dispute arbitration agreements. In addition, this Agreement does not prohibit the filing of administrative claims with government agencies, such as those made to the National Labor Relations Board or the Equal Employment Opportunity Commission, although any related dispute you bring would be subject to binding arbitration under this Agreement, to the extent permitted by law. This Agreement shall not preclude either party from seeking any provisional remedy (including a temporary restraining order or preliminary injunction) from a court in San Francisco County, California, if, absent such provisional relief, the arbitration award may be rendered ineffectual.

6. If any portion of this Agreement is deemed invalid, such as, for example, the prohibition on the right to participate in a representative lawsuit, that limited portion will be severed from this Agreement, and the remainder of the Agreement will remain enforceable. Notwithstanding any other provision in this Agreement, under no circumstances will this Agreement be construed to permit class, collective, or representative proceedings in arbitration.

7. Nothing in this Agreement restricts your ability to engage in communications or actions protected by applicable law, as described in Square's Reporting and Speak Up Policy (see "protected communications" section), available upon request and accessible at go/Legal.

# CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

Employee or Consultant Name: Chloe Happe

Effective Date:  July 18, 2019 | 5:48 PM PDT

As a condition of my engagement with, or becoming employed (or my employment being continued) by Square, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1. **Relationship.**  This Agreement will apply to my employment relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either re-employs me, engages me as a consultant, or I perform services for the Company, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing.  Any such employment or consulting relationship between the Company and me, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2. **Duties.**  I will perform for the Company such duties as may be designated by the Company from time to time or that are otherwise within the scope of the Relationship and not contrary to instructions from the Company.  During the Relationship, I will devote my entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

3. **Confidential Information.**

   a. **Protection of Information.**  I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information (as defined below) that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

   b. **Confidential Information.**  I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, developments, inventions, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts,

historical financial data, budgets, or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

c. **Third Party Information.** My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.

d. **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

4. **Ownership of Inventions.**

a. **Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date, belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's proposed businesses, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement.

b. **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into a product, process or machine any Invention not covered by Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute

under all applicable intellectual properties without restriction of any kind.

c. **Inventions.** I understand that "<u>Inventions</u>" means discoveries, developments, processes, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable, or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "<u>Company Inventions</u>" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 4(g) below.

d. **Assignment of Company Inventions.** I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions. I agree that all Inventions that (i) are developed using equipment, supplies, facilities or trade secrets of the Company, (ii) result from work performed by me for the Company, or (iii) relate to the Company's business or actual or demonstrably anticipated research and development (the "<u>Assigned Inventions</u>"), will be the sole and exclusive property of the Company. I agree to assign, and do hereby assign, the Assigned Inventions to the Company. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now

have or may hereafter have for infringement of any and all Company Inventions.

e. **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all Company Inventions made by me (solely or jointly with others) during the term of the Relationship.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format.  The records will be available to and remain the sole property of the Company at all times.  I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.  I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 5 and 6.

f. **Patent and Copyright Rights.**  I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any country, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall

continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world.  I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters of patents, copyright, mask work, and other registrations related to such Company Inventions.  This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

g.  **Exception to Assignments.**  I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B.  In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5.  **Company Property; Returning Company Documents.**  I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems or accounts (including, without limitation, files, e-mail messages, instant messages, social media accounts, and voice messages) and that my activity and any files or messages on or using any of those systems or accounts may be monitored at any time without notice.  I further agree that any property situated on the Company's premises or owned by or associated with the Company, including without limitation disks,storage media, filing cabinets, or other work areas, is subject to inspection by Company personnel at any time with or without notice.  I agree that, at the time of termination of the

Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, any membership accounts created for or associated with the Company and any access information thereof, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6. **Termination Certification.**  In the event of the termination of the Relationship (whether voluntary or involuntary), I agree that I will not have in my possession, nor will I fail to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Square, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further agree that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I agree that during the term of the Relationship, and for a period of twelve (12) months from the date of termination of the Relationship, whether with or

without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

7. **Notice to Third Parties.**  I understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement.

8. **Solicitation of Employees, Consultants and Other Parties.**  As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by the Company.  I further agree as follows:

   a. **Entire Agreement.**  I agree that this Confidential Information Invention Assignment Agreement supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between me and the Company regarding the matters described in this Agreement.

   b. **Other Parties.**  I agree that during the term of the Relationship I shall not use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

9. **At-Will Relationship.**  If applicable, I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company

is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly survive the termination of the Relationship.  I acknowledge that any statements or representations to the contrary are ineffective, unless put into a writing signed by the Company.  I further acknowledge that my participation in any stock option or benefit program is not to be construed as any assurance of continuing employment for any particular period of time.

10. **Name & Likeness Rights.**  I hereby authorize the Company to use, reuse, and to grant others the right to use and reuse, my name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed (including, but not limited to, film, video and digital or other electronic media), both during and after my employment, for whatever purposes the Company deems necessary.

11. **Representations and Covenants.**

   a. **Facilitation of Agreement.**  I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

   b. **No Conflicts.**  I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship.  I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party.  I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client,

employer or any other party. I acknowledge and agree that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

c. **Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.

d. **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this Agreement.  No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

e. **Remedies.**  I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

f. **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

g. **Amendment and Waivers.**  This Agreement may be amended only by a written agreement executed by each of the parties hereto.  No

amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

h. **Further Assurances.** The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

    i.   **<u>ADVICE OF COUNSEL</u>. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.**

By my signature below, I agree to comply and be bound by the terms and condition set forth in this Agreement, as of the Effective Date.

Signature:   *Chloe Happe*
                  6060D1F8F1894FF...

Legal Name: Chloe Happe

Date:  July 18, 2019 | 5:48 PM PDT

Address:

# CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

## **EXHIBIT A**

Please use the template below to LIST PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP EXCLUDED UNDER SECTION 4(a). If you have inventions or original works of authorship to disclose in addition to those listed on this page, please download and print this document; attach additional sheets; and sign, upload, and return the document, in its entirety, to Square.

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
| none  | none | none                                   |

*DS*
*CH*

_____ I have no inventions, improvements, or original works of authorship to disclose OR I have disclosed all inventions, improvements, or original works of authorship within this page

_____I have attached additional sheets to list inventions, improvements, or original works of authorship. This document must be downloaded, printed, initialed and returned along with additional sheets to Square.

Signature of Employee: *Chloe Happe*
6060D1F8F1894FF...

Print Name of Employee:  Chloe Happe                  Date: July 18, 2019 | 5:48 PM PDT

## **EXHIBIT B**

Section 2870 of the California Labor Code is as follows:

Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

Result from any work performed by the employee for the employer.

To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.